The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below.





Russ Kendig
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| IN RE: | CHAPTER 11 |
| JOSEPH J. DETWEILER, | CASE NO. 09-63377 |
| Debtor. | ADV. NO. 09-6105 |
| TENNESSEE COMMERCE BANK, | JUDGE RUSS KENDIG |
| Plaintiff, | |
| v. | |
| JOSEPH J. DETWEILER, | **MEMORANDUM OF OPINION (NOT INTENDED FOR PUBLICATION)** |
| Defendant. | |

Plaintiff's section 523(a)(6) action is before the court following trial on May 10, 2011. Plaintiff contends Debtor-defendant's sale of collateral, without Plaintiff's consent, was a willful and malicious injury and seeks a finding of nondischargeability from the court. Debtor denies Plaintiff's contention. Both sides submitted post-hearing briefs to the court.

The court has jurisdiction of this proceeding pursuant to 28 U.S.C. § 1334 and the general order of reference entered in this district on July 16, 1984. Venue in this district and division is proper pursuant to 28 U.S.C. § 1409. This is a core proceeding under 28 U.S.C. § 157(b)(I). The following constitutes the court's findings of facts and conclusions of law under Federal Rule of Bankruptcy Procedure 7052.

This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the Court.

## FACTUAL BACKGROUND

Debtor Joseph J. Detweiler is the principal and president of J.J. Detweiler Enterprises, Inc. ("JJDE"), a land development company. On September 10, 2007 and

December 31, 2007, JJDE borrowed money from American Bank Leasing Corporation. The loans were secured by properly perfected security interests in equipment ("the sawmills"). The loan documents required the consent of the lender before JJDE could transfer, assign or convey the sawmills and Debtor was aware of these loan covenants. Debtor personally guaranteed the loan. The debts were later assigned to Plaintiff.

JJDE used the sawmills for timbering 7,500 acres of land in rural Tennessee ("the tract"). JJDE had no previous timbering experience. The sawmills at issue were the only ones operated by JJDE. The bank holding a mortgage on the tract withdrew its consent for the timbering operation. JJDE considered moving the sawmills to another location for use but found that cost prohibitive. JJDE attempted, but was unable to obtain, theft insurance on the property. It hired a watchman to guard the sawmills because of previous experiences of theft and property damage at the site. JJDE offered the sawmills for sale and received several low offers for the sawmills, including a $40,000 offer, which Debtor described as "ridiculous."

In December 2008, JJDE sold the sawmills to a third-party, Kelly Woodyards, Inc. ("Woodyards") for $70,000. JJDE did not have Plaintiff's consent to sell the sawmills. The purchase agreement between JJDE and Woodyards required $50,000 down and four monthly installments of $5,000 on the remaining balance. Woodyards paid approximately $65,000 under the agreement: $50,000 down and three installments of approximately $5,000 each. The dates of the installment payments are unknown. Debtor did not pay the initial $50,000 in proceeds from Woodyards to Plaintiff. The proceeds were deposited in a general business account of JJDE and used to pay business expenses. Debtor did not receive any of the funds personally.

After the non-consensual sale of the sawmills, Debtor paid a total of $14,926.20[1] on the accounts via payments dated December 31, 2008, January 16, 2009 and May 1, 2009. JJDE filed a chapter 11 petition on June 18, 2009. Debtor filed for protection under chapter 11 on August 17, 2009. When JJDE filed bankruptcy, Plaintiff was owed $76,529.39 on the September 2007 loan and $17,520.04 on the December 2007 loan.

Plaintiff submitted the video deposition testimony of Dan Graber, the former general manager in charge of construction at Sequatchie Point. Mr. Graber was also a personal acquaintance of Debtor, who had been a friend of Mr. Graber's father. Mr. Graber had worked with Debtor and JJDE for several years, first selling land and then as a contractor. He was employed with JJDE at the time of the sale of the sawmills and had knowledge of the transaction. He stopped working for JJDE in August 2009, shortly after the bankruptcy filing.

Timothy Mortimer, an assistant vice-president with Tennessee Commerce Bank, also testified that if Debtor had sought approval for the equipment sale, the bank would have declined.

## LAW AND ARGUMENT

The issue is whether Debtor's sale of the sawmills was a willful and malicious injury

---

[1] JJDE made three payments of $4,047.59 on the September 2007 Master Equipment Financing Agreement and three payments of $927.81 on the December 2007 Master Equipment Financing Agreement.

2

under 11 U.S.C. § 523(a)(6). If it is, the debt owed Plaintiff is excepted from the section 727 discharge. To facilitate a fresh start for debtors, exceptions to discharge are strictly construed against creditors. Rembert v. AT & T Universal Card Serv., Inc. (In re Rembert), 141 F.3d 277 (6th Cir. 1998). The burden of proof, by a preponderance of the evidence, is on the Plaintiff. Sanderson Farms, Inc. v. Gasbarro, 299 Fed.Appx. 499 (6th Cir. 2008) (unpublished) (citing Meyers v. IRS (In re Meyers), 196 F.3d 622 (6th Cir. 1999)). If Plaintiff meets its burden, and "establishes a prima facie case, the burden shifts to [Debtor] to present credible evidence that a defense to the liability exists." JP Morgan Chase Bank, N.A. v. Zwosta (In re Zwosta), 395 B.R. 378, 382-83 (B.A.P. 6th Cir. 2008) (citing Sears, Roebuck & Co. v. Miller (In re Miller), 70 B.R. 55, 56 (Bankr. S.D. Ohio 1987)).

To satisfy the willful requirement, Plaintiff must show that Debtor either (1) willed or desired harm or (2) believed that injury was substantially likely to result from his conduct. Markowitz v. Campbell (In re Markowitz), 190 F.3d 455, 465 n.10 (6th Cir. 1999). Injuries caused by recklessness or negligence do not meet the willful standard. Kawaauhau v. Geiger, 523 U.S. 57 (1998). The malicious requirement is satisfied by proof that the Debtor acted "in conscious disregard of his duties or without just cause or excuse." Gonzalez v. Moffitt (In re Moffitt), 252 B.R. 916, 923 (B.A.P. 6th Cir. 2000) (citing Murray v. Wilcox (In re Wilcox), 229 B.R. 411, 419 (Bankr. N.D. Ohio 1998) (citations omitted)).

Clearly, Debtor intended to sell the sawmills. That cannot be disputed. By selling the sawmills without obtaining the consent of Plaintiff, which Debtor admits that he knew was required, Debtor acted in derogation of Plaintiff's rights. The record clearly supports a conclusion that Debtor exercised no care for the bank's interest in the property, but the question is whether he intended harm through his conduct.

The background is important. Debtor was involved in a single timbering operation. When the bank prohibited further timbering, the cost prevented Debtor from moving the equipment to another location. Debtor had experienced losses at the site where the sawmills were located and could not obtain theft insurance to protect the sawmills. He incurred expenses hiring a watchman to guard the equipment. During the same period, he admitted to experiencing financial problems. The payment history on Plaintiff's loans shows several late payments in the year before the sale occurred. Debtor not only wanted to sell the equipment, but probably needed to sell it.

Debtor admittedly knew of the bank's interest and knew he needed approval for a sale. Mr. Graber testified to a heated discussion with Debtor regarding the bank's security interest in the sawmills. According to Mr. Graber, when Debtor was reminded of the bank's interest, Debtor said "f*** the bank" and said it was his equipment and would file bankruptcy if things went awry. And less than six months later, JJDE filed. Two months after that, Debtor filed.

Mr. Graber indicated that he was personally advised not to get involved in the sale of the sawmills by Cheryl McDonald, Debtor's daughter and the secretary of JJDE, as well as counsel. As a result, Debtor was solely responsible for approving the deal with Woodyards. This testimony establishes that people around Debtor were concerned about the transaction. Debtor denied the conversation with Mr. Graber and denied any similar communications with others.

Debtor finally received an acceptable offer and sold the sawmills to Woodyards for $70,000. He testified that, at the time the equipment was sold, he intended to pay back the bank's loan. However, upon receipt of the initial $50,000 proceeds from the sale, the money

3

was deposited in JJDE's general account and used to pay general operating expenses. This action refutes his claimed intention to repay the bank. It creates a disconnect in Debtor's purported intent and his actions.

Through these above facts, Plaintiff established a prima facie case of a willful and malicious injury. The court finds Debtor knew that harm to the bank was substantially certain to result from his sale of the bank's collateral and the usurpation of the proceeds from the sale to pay other business expenses. Debtor was already making late payments on the accounts, yet he chose not to divert the proceeds. In this regard, the injury was willful. Debtor acted in conscious disregard of the rights of the bank. Debtor simply did not care that the sawmills were subject to liens in favor of Plaintiff and expressed as much to Mr. Graber. This satisfies the malice portion of the inquiry.

Debtor's defense is his claim that he intended to pay the bank and three additional payments were made.[2] Debtor is not completely credible on the former point and the court is not persuaded the payments have the import intended by Debtor. At the time of the sale of the sawmills, the December payments were already late, as evidenced by the late payment charges assessed on December 22, 2008. Debtor made two payments on the accounts in short order following the sale: one dated December 31, 2008 and one dated January 16, 2009. At this point, JJDE had $50,000 from the sale of the sawmills and was paying its normal expenses. The court concludes that the $50,000 allowed Debtor to fund the December 2008 and January 2009 payments. After that, JJDE missed three monthly payments (February, March and April 2009) and remitted the May 2009 payments prior to filing bankruptcy. This transaction history suggests as much of a planned cover-up as an intent to pay.

Also problematic is the fact that Debtor offered no explanation other than "I intended to pay." At some point JJDE received an additional $15,000 from Woodyards. Plaintiff's account histories show it only received approximately $5,000 after the January 16, 2009. The suggestion is that not only did Debtor take all or some of the initial $50,000 proceeds and use them for general expenses, but also did the same with the three $5,000 installment payments. Paying the secured party and paying general business expenses are not equivalent.

Mr. Graber was credible and provided corroborating testimony about statements of others and related facts. Debtor did nothing to rebut any of this except to blankly deny.

Plaintiff has shown that the greater weight of the evidence is in its favor. Debtor has not offered a plausible defense. The court finds that Debtor acted willfully and maliciously when he sold the sawmills and the debt resulting from the conversion is nondischargeable.

The parties dispute the amount of the debt which is nondischargeable. Plaintiff argues the debt is $70,000, the value of the collateral at the time of the sale, while Debtor contends it is $70,000 less the subsequent payments. Plaintiff is correct. "Where a debtor is found liable for conversion under 11 U.S.C. § 523(a)(6), the appropriate measure of damages is an amount equal to injury caused by the Debtor, rather than any other sum owed by the debtor." Bonfiglio v. Harkema Assoc., Inc., 171 B.R. 245, 251 (E.D. Mich. 1994) (citing In re Modicue, 926 F.2d 452, 453 (5th Cir. 1991)); see also Panel Town of Dayton, Inc. v. Corrigan (In re Panel Town of Dayton, Inc.), 338 B.R. 764 (Bankr. S.D. Ohio 2006) (citing Tabar v. Charlie's Towing Serv., Inc., 97 Ohio App.3d 423 (8th Dist. Ct. App. 1994)

---

[2] The court interprets this the "three payments" to encompass three payments on each of the Master Equipment Financing Accounts held by Plaintiff.

*discretionary appeal denied*, 70 Ohio St.3d 1428 (1994)); Warren Producers, Inc. v. Abbott, 2009 WL 151556 (Bankr. W.D. Ky. 2009).

    Debtor's testimony established the fair market value of Plaintiff's collateral was $70,000, the selling price. When the collateral was sold, Plaintiff lost the $70,000 protection offered by the collateral and was thereby damaged $70,000. The fact that Plaintiff received payments after this is immaterial because the sale deprived it of its security. The subsequent payments did not compensate it for the loss but merely reduced the overall debt. The total debt still exceeds the value of the collateral. Consequently, Debtor's position is not well-taken. The measure of Plaintiff's damages is from the conversion is $70,000.

    An appropriate order shall be entered in conjunction with this opinion.

#    #    #

**Service List:**

Christy A. Prince
65 East State Street
Suite 1800
Columbus, OH 43215

Kenneth R Cookson
65 East State Street
18th Floor
Columbus, OH 43215

Anthony J DeGirolamo
116 Cleveland Ave., N.W.
Suite 307
Canton, OH 44702

Scott M Zurakowski
PO Box 36963
4775 Munson St NW
Canton, OH 44735-6963